UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SPARTON TECHNOLOGY, INC.,
A New Mexico corporation,

    Plaintiff,

-vs-

UTIL-LINK, LLC, a Delaware Limited
Liability Company, NATIONAL RURAL
TELECOMMUNICATIONS COOPERATIVE,
a District of Columbia corporation,

    Defendants.
_____/

Case No. 02-CV-73819-DT
HON AVERN COHN

## AMENDED DECISION ON DEFENDANT'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND NEW TRIAL

### I. INTRODUCTION

This is a contract case. On November 7, 2005, following a sixteen (16) day trial, a jury returned a verdict in favor of plaintiff for $494,644.23 on the claim that defendant[1] breached the 1997 manufacturing agreement by failing to pay for obsolete materials and for $3,087,043.09 on the claim that plaintiff justifiably relied on promises by defendant which defendant should have reasonably expected would induce action by plaintiff with respect to excess raw materials. The jury rejected plaintiff's claim that defendant breached the 1997 manufacturing agreement by failing to pay for testing equipment. The jury also

---

[1]Initially there were two defendants named in the case, Util-Link, LLC and National Rural Telecommunications Cooperative (NRTC). Although Util-Link, LLC was a separate entity at the inception of the parties' relationship, it ultimately became a wholly owned subsidiary of NRTC and was later dissolved. The jury was instructed to treat the two defendants as a single entity.

found that the parties contracted for an additional 35,000 LINKS,[2] LINKS being the subject matter of the relationship, and that defendant did not breach this agreement by failing to purchase these LINKS. Lastly, the jury rejected defendant's claim that plaintiff breached the 1997 manufacturing agreement by producing LINKS which were defective and by failing to repair and replace defective LINKS. A judgment for $3,581,687.32 was entered in favor of plaintiff on November 8, 2005.

Now before the Court are defendant's motions for judgment as a matter of law and new trial on grounds which will be discussed *seriatim*. For the reasons which follow, defendant's motion for judgment as a matter of law is DENIED, defendant's motion for a new trial is GRANTED on the obsolete materials claim unless plaintiff agrees to a remittitur as will be described, and GRANTED on plaintiff's raw materials claim unless plaintiff agrees to a remittitur as will be described.

## II. BACKGROUND

The background of the case is described in the Memorandum and Order Granting in Part and Denying in Part Defendant's Motion for Partial Summary Judgment and Denying Plaintiff's Partial Motion for Summary Judgment, filed September 2, 2004.

Pretrial proceedings as well as the trial were contentious and grossly over-lawyered.

No useful purpose would be served by an extended discussion of the testimony and exhibits at trial;[3] rather, such of the evidence as is relevant will be discussed in considering the various grounds asserted in defendant's motions.

---

[2] A LINK is an automated meter reading device at a residence which transmits electrical usage data over the residential telephone line to a central location for billing.

[3] Over 20 witnesses testified live or by deposition. Plaintiff placed in evidence over 100 exhibits; defendant placed in evidence over 50 exhibits.

## III.  LEGAL STANDARDS

By agreement of the parties Tennessee law governs.

Defendant does not discuss the standards to be followed by the Court in deciding a motion for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b) or a motion for new trial under Fed. R. Civ. P. 59.

In a diversity case such as this, state law governs a Rule 50(b) motion.  Morales v. American Honda Motor Co., Inc., 151 F.3d 500 (6th Cir. 1998).  Federal law, however, governs a Rule 59 motion.  Id.

On a JMOL motion Tennessee law

> [requires] that trial judges and appellate courts take the strongest legitimate view of the evidence in favor of the plaintiff, allow all reasonable inferences to be drawn therefrom in his favor, discard all countervailing evidence and deny the motion if there is any doubt as to the conclusions to be drawn from the whole evidence; a verdict should be directed only if reasonable minds could draw but one conclusion."

Saul v. Evans, 635 S.W.2d 377, 379 (Tenn. 1982) (citations omitted).

In this Circuit, the standard for granting a motion for new trial is as follows:

> A court may set aside a verdict and grant a new trial when it is of the opinion that the verdict is against the clear weight of the evidence; however, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence unless that verdict was unreasonable.  Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper.

Tisdale v. Federal Express Corp., 415 F.3d 516, 528-29 (6th Cir. 2005)(quoting Barnes v. Owens-Corning Fiberglass Corp., 201 F.3d 815, 820-21 (6th Cir. 2000)).

Although defendant has not moved for a remittitur, in light of the Court's finding that a new trial is warranted unless plaintiff agrees to a remittitur, it is appropriate to set forth the grounds for a remittitur.  "[A] motion for new trial seeking a remittitur of a jury's verdict

3

... should be granted only if the award clearly exceeds the amount which, under the evidence in the case, was the maximum that a jury could reasonably find." Roush v. KFC Nat'l Management Co., 10 F.3d 392, 397 (6th Cir. 1993) (citation and internal quotation marks omitted).  Importantly, "[w]here '[t]he defects in the award are readily identified and measured, remittitur is more appropriate than a new trial." Strickland v. Owens Corning, 142 F.3d 353, 359 (quoting Kolb v. Goldring, Inc., 694 F.2d 869, 875 (1st Cir.1982) (ordering a new trial on the question of damages unless plaintiff consents to a remittitur)).

With these standards in mind, the Court will consider defendant's motions.

## IV.  THE OBSOLETE MATERIALS CLAIM

Defendant asserts there is not sufficient evidence to support the jury's finding that it breached the 1997 manufacturing agreement by failing to pay for raw materials made obsolete by change orders, and if there is such evidence, it is insufficient to support the $494,000.00 loss claimed by plaintiff.

Plaintiff says that paragraph 3.3 of the 1997 manufacturing agreement (PX 1) provides for changes in the initial specifications of the LINK, and that the price increases or decreases occasioned by change orders were subject to joint agreement.  Changes were made in the specifications over time, and in the course of the changes defendant agreed to be responsible for the cost of raw materials made obsolete by the changes.

Under the 1997 manufacturing agreement, plaintiff was to manufacture 75,000 LINKS to defendant's design at a fixed price to be delivered over a two (2) year period. Plaintiff was to be responsible for "all materials procurement including mechanical

4

components, inventory costs. . . ."[4]  Defendant had the right to change the specifications by engineering change notices.  Price changes were to be jointly agreed upon.

Notwithstanding the multitude of e-mails and memoranda of conversations and the like between the parties, there is no document which mentions obsolete raw materials or reflects an indication that the costs of such raw materials made obsolete by change orders were to be charged to defendant and were not reflected in the adjustment of prices occasioned by changes in the specifications.  Indeed, nothing was said in the 1997 manufacturing agreement, *per se*, about raw materials made obsolete by the changes.  Thus, plaintiff's assertion that defendant was to be responsible for the cost of raw materials in inventory made obsolete by change orders rests on its version of the conclusions to be drawn from the conversations between the parties regarding change orders.  Viewing this evidence in a light most favorable to plaintiff, the Court is satisfied that it was not unreasonable for the jury to find that in the conversations between the parties relating to change orders defendant agreed to be responsible for the cost of obsolete raw materials outside the price charges occasioned by the change orders.  As such, defendant is not entitled to a JMOL on this claim.

As to the amount of the verdict however, the evidence supports a loss to plaintiff at the most of $171,360.00, not the $494,644.23 awarded by the jury.  There are serious defects in the proofs as to the dollar amount of the obsolete raw materials claimed by plaintiff.

Plaintiff in its response brief cites five (5) exhibits which arguably support and define

---

[4]Plaintiff is a contract manufacturer.  It does not hold raw materials in inventory; rather, it purchases raw materials on the basis of sales orders and forecasts.

5

the amount of its damages for obsolete raw materials. The exhibits, however, do not do that.

> PX 101 -   This is the initial bill of materials. It reflects each of the parts used in the assembly of a LINK.
>
> PX 253 -   This is a compilation of change orders. The change orders are intended to reflect the changes in the parts of a LINK. The change orders do not display the particulars of parts deleted and added or changes in the prices of a LINK occasioned by the change orders. The change orders also do not describe raw materials which were made obsolete by the change orders.
>
> PX 59 -    This is presumably the last bill of materials intended to describe the specifications for a LINK in its last ideation. It does not coordinate with PX 101. Likewise, PX 101 and PX 253 are not coordinated so as to describe raw materials which became obsolete as a consequence of change orders.
>
> PX 11 -    This is a description of the obsolete raw materials held by plaintiff including the number on hand and dollar value. There are twelve (12) in number; only six (6) are listed as "removal - redesign." The reasons for being obsolete for the other six (6) have nothing to do with redesign. The dollar value of the six (6) which became obsolete by reason of redesign is $171,369.00.
>
> PX 55 -    This is a summary of the total of the damages claimed by plaintiff. For obsolete raw materials it includes cost, interest and related charges consisting of in-bound freight, recurring capital/safeguarding costs of storage, and cost of managing inventories for the 4 years ended June 30, 2005. There is no explanation of why plaintiff did not dispose of the obsolete raw materials once they became obsolete.

Although the Court accepts that the jury reasonably found that defendant agreed to be responsible for the cost of obsolete raw materials outside the price charges occasioned by the change orders, the evidence, outlined above, supports a loss to plaintiff at the most of $171,360.00. Therefore, unless plaintiff accepts a remittitur **within 10 days** as to the amount of loss suffered by Sparton for obsolete materials of $171,360.00, defendant is entitled to a new trial on this claim.

6

## V.  THE EXCESS RAW MATERIALS CLAIM

### A.  REINSTATEMENT OF THE PROMISSORY AND EQUITABLE ESTOPPEL CLAIMS

Counts 4 and 5 of the complaint asserted claims of promissory and equitable estoppel arising out of the acquisition of raw materials by plaintiff in anticipation of an order for an additional 75,000 LINKS by defendant.  These claims were dismissed in the Memorandum and Order of September 2, 2004 on the grounds that plaintiff was unable to identify any evidence of reliance.  On September 30, 2005 the Court entered an order reinstating these claims for the reasons stated in the Order Reinstating Plaintiff's Claims of Promissory and Equitable Estoppel.

Defendant now asserts that it was improper to reinstate these claims because defendant prepared for and began the trial based on the Court's earlier determination that it faced only a claim for breach of contract.  Plaintiff says in response that defendant has not shown that it was prejudiced by reinstatement of these claims.

Notwithstanding the jury's ultimate finding that there was a contract for an additional 35,000 LINKS, it was clear to the Court after only a few days of trial that the parties never entered into a contract for additional LINKS, and that what the evidence likely showed was that plaintiff was led to believe by defendant that it intended to order an additional 35,000 LINKS and therefore managed its raw materials inventory to assure that it was in a position to manufacture the additional LINKS once it received orders for them without delay.  This in essence was the reason for reinstating the claims of promissory and equitable estoppel.

Defendant has not shown any substantive prejudice by reinstatement of these claims.  At the time these claims were dismissed, discovery was almost complete, and all of the deposition testimony used at trial available.  Defendant did not ask for a recess so

7

it could take additional deposition testimony or better prepare itself to meet these claims. Defendant did not ask that any witness whose testimony had been completed be recalled. Defendant had yet to present its defense.

In sum, defendant simply argues prejudice. Defendant had a full and fair opportunity to meet the claims of promissory and equitable estoppel and offers no good reason for the Court to reconsider the order reinstating these claims.

### B.  THE RELATIONSHIP BETWEEN THE CONTRACT FOR 35,000 ADDITIONAL LINKS AND THE ESTOPPEL CLAIM

**1.**

The jury found that the parties contracted for 35,000 additional LINKS and that defendant did not breach the contract by failing to purchase them. The jury also found that plaintiff justifiably relied on a promise by defendant which defendant should have reasonably expected would induce action by plaintiff with respect to excess raw materials. Defendant says that these two findings are inconsistent, and therefore the Court must set aside the estoppel finding.

Plaintiff responds by saying (1) defendant waived any inconsistency in the form of the verdict and (2) when the jury returned with the inconsistent finding defendant should have immediately called it to the Court's attention and asked that the jury be told of the inconsistency and be given the opportunity to reexamine its verdict. Additionally, plaintiff says that there was no inconsistency between the jury finding that there was a contract for an additional 35,000 LINKS and the jury finding defendant was estopped to deny a promise relating to excess raw materials since the two covered separate subject matter.

There is no need for the Court to involve itself in the esoterica of the right of plaintiff to assert both a contract and an estoppel, or whether when there is a contract which binds

8

the parties, a party may not rely on an estoppel. The fact of the matter is that there was not an enforceable contract for 35,000 additional LINKS.

**2.**

The evidence at trial established the following:

Beginning late in 2000, the parties began discussing a contract for an additional 35,000 LINKS. They did not come to a complete agreement because of disagreement over price. By the end of June, 2001, plaintiff was desperate to obtain a purchase order for additional LINKS, since it had on hand some $1.6 million dollars in raw materials which it would have to write off. On June 30, 2001, at plaintiff's urging, defendant issued a purchase order (PX 38) reading as follows:

> This is a blanket agreement indicating Util-LINK'S intent to purchase 35,000 units of the Link AMR from Sparton Electronics, Inc.
>
> Orders for specified quantities of product units will be issued by firm releases only against this blanket agreement and will be so identified by written directives from the President of Util-LINK, or his authorized designee.
>
> The production release quantities will be in minimums of 5,000 units.
>
> <u>Util-LINK is under obligation to purchase only quantities specifically released under this blanket agreement. Util-LINK will incur no penalty or liability for any units or raw material inventory beyond the firm release. Util-LINK may cancel this blanket agreement at any time without liability or penalty for units beyond the firm release</u>.[5]
>
> Util-LINK will be obligated for units under the current firm release.
>
> The purchase price for units under this blanket agreement is

---

[5]Emphasis added.

$109 per unit.

Delivery items will be identified in each respective release.

Clearly, defendant was not obligated to purchase 35,000 LINKS under the purchase order until it issued releases, and since it never issued releases, there was no obligation, and since there was no obligation, there was no breach.

Looking at the instructions to the jury, it is clear that there is no inconsistency between the finding of a contract and a finding of an estoppel, as reflected in the verdict. The instructions read:

> . . .you are required to decide whether NRTC entered into a contract with Sparton requiring NRTC to purchase an additional 35,000 units beyond the initial 75,000 units covered by the 1997 Manufacturing Agreement.  In order to answer this question "yes," Sparton has the burden of proof to establish by a preponderance of the evidence that there was such a contract.
>
> A contract is an agreement or exchange of promises between two or more persons to do or not to do certain things.  This agreement or exchange of promises can be oral or in writing and must be supported by something of value.  The requirements for a valid contract are an offer, an acceptance, consideration, competent parties and a legal purpose.  A contract for the sale of goods (such as the LINKs) can be made in any manner sufficient to show agreement.
>
> One of the issues you must decide is whether a contract was formed which obligated NRTC to purchase additional LINK units beyond the initial 75,000 covered under the 1997 Manufacturing Agreement.
>
> An offer occurs when one party communicates to the other a willingness to enter into a contract.  The communication must be made under circumstances that would justify the other party in understanding that an agreement would result if the offer were accepted.
>
> An acceptance occurs when a party communicates by words or actions an agreement to the essential terms of an offer.  It

10

must be made before the offer is withdrawn and must match the essential terms of the offer, although it may include additional or different terms than those included in the offer.

For there to be a sufficient exchange of consideration, something of value must be bargained for and given in exchange for the other party's promise. Something of value may be a promise, an act, or forbearance. It can be a benefit to one party or a detriment to the other party. Its actual value in money terms is not important.

A contract can be made up of several different documents if the parties intended that the various documents would be one contract.

Sparton says it made an offer to NRTC to manufacture the additional 35,000 units. Sparton also says NRTC sent a written response to its offer. You must decide whether the response was an acceptance of Sparton's offer.

NRTC's response was an acceptance if it indicated NRTC had a present intention of buying 35,000 additional units even though NRTC's response stated terms that were not in Sparton's offer or that were different from those in Sparton's offer. However, if the response indicated that NRTC intended to accept Sparton's offer only if Sparton agreed to the additional or different terms, then the response is not an acceptance unless Sparton later indicated in any reasonable manner that it agreed upon those terms.

If you decide that the writings of Sparton and NRTC are sufficient to establish an enforceable contract for the purchase of an additional 35,000 LINKs, you must then decide what terms were included in the contract.

If you find the parties agreed upon all essential terms, then the contract will only include those terms in the offer to which the parties agreed; however, the contract can be found to include additional or different terms contained in NRTC's written acceptance if Sparton through its words or actions indicated in any reasonable manner that it agreed to the additional or different terms.

What the parties say they intended or thought is not to be used in determining whether an agreement was made or the terms of the agreement. Rather, you must look to the outward

11

manifestations of intent, such as what the parties wrote or did or said to see if an agreement was made and what the terms of the agreement are.

If you find that there was a contract requiring NRTC to purchase 35,000 additional units, then you must determine whether NRTC breached the contract for the purchase of the 35,000 units. If a party does not perform according to the contract terms, that party has committed a breach of the contract. Any unexcused breach of contract allows a non-breaching party to recover damages.

Sparton claims that NRTC breached a contract for the purchase of 35,000 LINK units in the following instances: by indicating that it would not purchase any of the 35,000 LINK units and thereafter failing to purchase any of the units, and by failing to reimburse Sparton for the costs of certain raw materials. NRTC denies this. Sparton has the burden of proving that a contract existed for the purchase of the 35,000 units, that NRTC breached the contract, and that Sparton was damaged as a proximate result of the breach of the contract. NRTC asserts that no contract was entered into requiring the purchase of the 35,000 units and, in any event, raw materials were not acquired under circumstances where their cost is recoverable. NRTC has the burden of proving these defenses.

* * *

If you award damages to Sparton for breach of contract by NRTC, then you need not consider the estoppel claims. If, however, you do not award damages to Sparton for breach of contract, then you must consider the estoppel claims. Sparton asserts, in addition to its claim of a contract for 35,000 additional LINK units, that it was induced by NRTC promises to acquire the excess raw materials that were available for production of 35,000 additional units. To prevail on this claim, Sparton must prove by a preponderance of the evidence that, first, NRTC made promises which it should have reasonably expected to induce action by Sparton to acquire additional raw materials or to withhold taking action to cancel orders for raw materials and, second, which did in fact induce Sparton to acquire such raw materials or to withhold taking action to cancel orders for raw materials. If you find a promise was made but that Sparton's reliance was unreasonable or unjustified, then you must answer "no" to Question C1.

The instructions explained to the jury the differences between a contract claim and an estoppel claim. Thus, it was not inconsistent for the jury to find there was a contract, that is was not breached, and therefore Sparton was not entitled to contract damages and to go on and consider whether principles of estoppel require the Sparton be compensated relating to a promise regarding excess raw materials.

### C. THE RELIANCE ELEMENT

As stated above, on the claim of estoppel, for plaintiff to prevail the jury had to find that plaintiff

> . . .reasonably relied on facts which [defendant] misrepresented or concealed [etc]. . .

Defendant asserts that there was not sufficient evidence to support the jury's finding that plaintiff reasonably relied on anything defendant said or did in acquiring the excess raw materials.

While during and particularly at the end of trial, the Court expressed considerable skepticism that plaintiff established the requisites of a claim of estoppel, analysis of the documentary trail cited in plaintiff's brief has dispelled the Court's doubts.[6] A careful read of the trail consisting of e-mails and memoranda of conversations leads to the conclusion that the jury's verdict on estoppel should neither be overturned nor this claim retried. There is sufficient evidence to support the jury's finding. The trail follows:

PX 44 -   10/3/00 - handwritten notes of Steven Collier (defendant's point man) regarding conversation between the parties forecasting 4,200 a month requirement for 2001.

PX 12 -   10/13/00 - e-mail from Collier to Charles Stranko (plaintiff's point man)

---

[6]"Truth isn't in accounts but in account books," Josephine Tey, Daughter of Time, 96 (Penguin Books 1951).

> stating defendant's sales projection for 2001 - 3,600 LINKs a month for a total of 43,000 - may go as high as 6,500 a month.

PX 43 -    01/11/01 - Colllier's handwritten notes of a conversation - "MATERIAL LIABILITY > $2MM".

PX 16 -    02/01/01 - e-mail - Collier to Stranko - 64,000 LINKs projected for 2001

PX 19 -    02/28/01 - e-mail - Collier to Stranko - 5,000 per month production level

PX 20 -    03/05/01 - memorandum - Stranko to Collier - "considerable materials have been placed on order on verbal communications without written contractual commitments such as PO from Util-LINK.  These orders must be canceled.  Sparton has no option but to begin cancellation starting Monday, March 6.  Naturally with any cancellations there will be significant risk to maintaining continuity."

PX 46 -    03/16/01 - Purchase order for 15,000 LINKs.[7]

PX 29 -    05/01/01 - e-mail Collier to Janna Mitchell (plaintiff's representative) - "NRTC has communicated to Util-LINK via its official sales projections that it intends to sell a total of 65,000 LINK 340-HL units in 2001 and therefore intends to purchase from Util-LINK intends 15,000 - 20,000 additional LINK 340-HL units through one or more additional purchase orders.  Therefore, Util-LINK commits to order such additional LINK 340-HL units from Sparton through one or more additional purchase orders within the next 90 to 150 days."

PX 38 -    06/30/01 - purchase order for 35,000 LINKS [set forth above]

PX 143 -   08/20/01 - e-mail - Stranko to Collier - "it has also come to my attention that you have advised Technology Forecasters during an interview that Sparton will not be seeing any additional business over the 27,000 unit recall. I must say this public comment disturbs me on several levels."

In addition to the chronological account of the document trail, plaintiff in its brief describes in considerable detail the evidence supporting its position that its practice was to hold and purchase raw materials in advance based on sales forecasts provided by

---

[7]No releases were issued by defendant under this purchase order.

defendant to assure that sufficient raw materials were on hand to meet the anticipated requirements of forthcoming purchase orders. The chronological account details sales forecasts by defendant beginning in late 2000 and the first six (6) months of 2002 which initially called for an additional 15,000 LINKS and then 35,000 LINKS over and above the 75,000 LINKS called for by the 1997 manufacturing agreement. This evidence supports the finding that it was in response to these forecasts that plaintiff continued to hold in inventory raw materials purchased for the manufacture of the initial 75,000 LINKs, and purchased additional raw materials in anticipation of receiving orders for LINKs beyond the 75,000, that defendant knew it and defendant did nothing to suggest to plaintiff it should not do so.

In sum, there is no good reason to reject the jury's finding that in the circumstances of defendant's actions between October, 2000 and the end of June, 2001, defendant should account to plaintiff for the cost of the raw materials it held in inventory to assure it would begin production of LINKs beyond the 75,000 as soon as purchase orders and releases were issued by defendant.

### D. DECISION-MAKER ON ESTOPPEL CLAIM

Defendant says it was improper for the Court to submit the estoppel claim to the jury; it was for the Court to decide, citing Aussenberg v. Kramer, 944 S.W.2d 367, 370 (Tenn Ct. App. 1990). Plaintiff does not respond to this assertion. Defendant's position is not well taken. Aussenberg dealt with undisputed facts. Here, there were disputed facts as the Court clearly indicated when it reinstated the estoppel claims. In any event, Fed. R. Civ. P. 39(c) allows for an advisory jury on the Court's motion. Assuming defendant is right, the Court accepts the advice of the jury. There was sufficient evidence at trial for the jury to

find for plaintiff on the estoppel issue.

### E.  THE DAMAGES AWARD

Defendant says that the damages award of $3,087,043.09 on the estoppel claim has no rational connection to the evidence at trial.  Inexplicably, plaintiff did not directly respond to the assertion.

The $3,087,043.09 is made up of the dollar amount of raw materials plaintiff had in inventory which it says were either held or purchased in anticipation of purchase orders and releases for the 35,000 additional LINKs previously discussed, and what it characterized as related costs, *i.e.*, "initial inventory ordering and in-bound freight, the recurring capital/safeguarding costs of storage, and costs to manage inventories for the 4 years ended June 30, 2005, and interest for the 15 month period from July 1, 2001 through September 30, 2002."  The amounts requested are as follows:

| | |
|---|---|
| Excess inventory | $1,927,208.09 |
| Related charges | $1,012,407.00 |
| Interest | $  147,428.00 |
| | $3,087,043.09 |

Plaintiff invoiced defendant for the raw material inventory on May 21, 2002 for $2,210.481.16 as follows (DX 29):

| | | |
|---|---|---|
| Raw inventory total | | $1,747,415.94 |
| | | |
| Cost of capital - raw material | | |
| Inventory total | 12% | $ 209,689.91 |
| Material handling | 8.5% | $ 148,530.35 |
| Taxes and Insurance | 3% | $   52,422.48 |
| Freight | 3% | $    52,422.48 |
| | | $2,210,481.10 |

There is no good explanation in the evidence why plaintiff continued to hold in inventory the raw materials and did not dispose of them once it knew that no further orders

would be forthcoming from defendant. This plaintiff certainly knew by the end of August, 2001. As noted above, on August 20, 2001 Stranko e-mailed Collier in part as follows (PX 143):

> It has also come to my attention that you have advised Technology Forecasters during an interview that Sparton will not be seeing any additional business due to the 27,000 unit recall. I must say this public comment disturbs me on several levels.

The jury having found that plaintiff justifiably relied on defendant's representation that orders for 35,000 additional LINKs would be forthcoming, it was reasonable for plaintiff to hold in inventory raw materials sufficient to meet that production. Once, however, plaintiff knew that the orders would not be forthcoming it was no longer reasonable for plaintiff to maintain the raw materials in inventory. As such, plaintiff at most is entitled to damages in the amount of $1,747,415.94. Unless plaintiff agrees to a remittitur to that amount within ten (10) days, defendant is entitled to a new trial.

The decision to require a remittitur rather than a new trial does not ignore defendant's argument that it is not possible on the evidence to separate out raw materials acquired in excess of those needed for the initial order for 75,000 LINKs and raw materials ordered specifically in anticipation of the 35,000 additional LINKs. What this argument ignores is the fact that the raw materials in excess of that needed to produce 75,000 LINKs were continued to be held in inventory to assure an adequate supply of raw materials to produce the 35,000 additional LINKs.

### VI. BREACH OF THE 1997 MANUFACTURING AGREEMENT: DEFECTIVE LINKS

Defendant takes issue with the jury finding that plaintiff did not breach the 1997 manufacturing agreement by producing LINKs which were defective. Apparently,

17

defendant does not contest the jury finding that plaintiff's breach did not extend to its failure to repair and replace LINKs which were defective.

Plaintiff argues to the contrary. It says that to find a breach the evidence must support a finding that the breach was material and not minor, and that the defects such as they were in certain of the LINKs was not significant and in any event these defects were taken care of.

Defendant in reply says that materiality is not an element in deciding if there was a breach since the instructions did not state that the breach must be material. Any defect in a LINK must be considered a breach according to defendant.

The jury was instructed as follows:

> NRTC claims that Sparton breached its obligations under the 1997 manufacturing agreement by producing LINK units with manufacturing defects and by failing to promptly repair or replace these units at no cost. Sparton denies this claim.
>
> NRTC has the burden to prove by a preponderance of the evidence that Sparton breached its obligations under the 1997 manufacturing agreement, and that NRTC was damaged as a proximate result of the breach of the 1997 manufacturing agreement.
>
> You must determine whether Sparton breached the 1997 manufacturing agreement. If Sparton did not perform according to the contract terms, Sparton breached the contract. An unexcused breach of a contract allows the non-breaching party to recover damages.

Fairly read, the jury was told that to find a breach it had to find LINKs were produced with manufacturing defects <u>and</u> that the LINKs with manufacturing defects were not promptly repaired or replaced at no cost to defendant.

There is no need for any extended discussion on this issue. There was evidence that a small number of LINKs suffered from defects such as pinched "O" rings, mismatched

18

case IDs and the like. These defects did not make the LINKs which suffered from defects inoperative, and in any event when defects in a LINK were called to plaintiff's attention it took immediate steps to either repair or replace the LINK. The vast majority of the problems from which LINKs suffered were a result of design failure, an element that was defendant's responsibility and not plaintiff's. The jury's finding of no breach was therefore reasonable in light of the evidence.

Also relevant to this issue is the fact that at no time prior to the filing of suit did defendant assert a breach of contract claim against plaintiff or suggest that plaintiff's production of defective LINKs was the proximate cause of defendant's loss of investment in its LINK venture. Rather, defendant asserted this claim after plaintiff filed suit.

## VII. CONCLUSION

When all is said and done regarding the trial, the jury's verdict, and post-trial motions, it is fair to say that this is a case that never should have gone to trial. The fallout from the defeated expectations of each of the parties should have been resolved by the application of common sense and negotiation.

Defendant entered into the LINK program with high expectations. These expectations were defeated for two main reasons. The first reason is that LINK technology was sophisticated and was not sufficiently advanced at the time LINKs went commercial to eliminate the bugs. For the most part it was design defects that thwarted market acceptance. Second, remote meter reading devices came on the market which were more efficient than the LINK, and these competitive devices displaced the market for LINKs. Defendant eventually abandoned the LINK program because it could use its capital to better effect. None of this was plaintiff's fault.

As to plaintiff, defendant's troubles were its troubles because plaintiff depended on orders from defendant to make its manufacturing program profitable. Plaintiff did not well manage its inventory of raw materials or it's program. As soon as it became aware that defendant did not intend to order additional LINKs, it should have disposed of its inventory of raw materials.

If plaintiff accepts the remittitur, **within 10 days**, there is no good reason to require the damages phase of this case to be retried. If plaintiff declines to accept the remittitur, **within 10 days**, defendant is entitled to a new trial.

Lastly, there is no good reason to give defendant a chance at a second jury on its liability claim against plaintiff.

SO ORDERED.

   s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE

Dated: March 27, 2006

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 27, 2006, by electronic and/or ordinary mail.

   s/Julie Owens
Case Manager
(313) 234-5160